1  Ronald Y. Rothstein (*pro hac vice*)
   RRothste@winston.com
2  Sean Suber (*pro hac vice*)
   SSuber@winston.com
3  WINSTON & STRAWN LLP
   35 West Wacker Drive
4  Chicago, IL 60601-9703
   Telephone: (312) 558-5600
5  Facsimile: (312) 558-5700

6  Shawn R. Obi (SBN: 288088)
   SObi@winston.com
7  WINSTON & STRAWN LLP
   333 South Grand Avenue
8  Los Angeles, CA 90071-1543
   Telephone: (213) 615-1700
9  Facsimile: (213) 615-1750

10 *Attorneys for Defendants*
   *Central Garden & Pet Company and*
11 *Breeder's Choice Pet Foods, Inc.*

12

13              **UNITED STATES DISTRICT COURT**

14             **NORTHERN DISTRICT OF CALIFORNIA**

15

16 **AARON BRAND** and **JOHN FLODIN**, individually    Case No. 4:21-cv-01631-JST
   and on behalf of all others similarly situated,
17                                                        **OPPOSITION TO PLAINTIFFS' MOTION FOR**
                 Plaintiffs,                              **CLASS CERTIFICATION**
18
                                                         Date:     September 19, 2024
19       v.                                              Time:     2:00 p.m.
                                                         Place:    Courtroom 6 – 2nd Floor
20 **CENTRAL GARDEN & PET COMPANY**, a Delaware                    Oakland Courthouse
   Corporation, **BREEDER'S CHOICE PET FOODS,**                    1301 Clay Street
21 **INC.**, and **DOES 1–50**, inclusive,                          Oakland, CA 94612

22               Defendants.                             Judge:   Hon. Jon S. Tigar

23

24

25

26

27

28

TABLE OF CONTENTS

Page

I.    Introduction ....................................................................................................... 1

II.   Background ........................................................................................................ 2

      A.    The Products ........................................................................................... 2

            1.    The amount of avocado in AvoDerm is meaningful and significant. ............... 2

            2.    AvoDerm contains "real" avocado and the labeling does not violate FDA
                  regulations. .................................................................................................. 3

      B.    The Alleged Misrepresentations and Central Questions ............................................. 5

      C.    The Named Plaintiffs ................................................................................ 9

III.  Legal Standard ................................................................................................ 10

IV.   Argument ......................................................................................................... 12

      A.    There is no evidence of class-wide deception, reliance, or causation. ...................... 12

            1.    Plaintiffs fail to establish a controlling definition and uniform understanding
                  for the phrase main ingredient or the Alleged Avocado Misrepresentations.. 12

            2.    Plaintiffs cannot demonstrate class-wide exposure. ................................... 15

            3.    Plaintiffs do not show that deception is subject to common proof. ................ 16

            4.    Individual issues predominate because Plaintiffs have provided no common
                  evidence of materiality. ............................................................................. 20

            5.    The proposed Washington class's claim requires individualized proof of
                  causation and reliance. ............................................................................. 23

      B.    There is no reliable, let alone admissible, evidence of damages. ............................. 25

      C.    The Named Plaintiffs cannot serve as class representatives. .................................. 28

            1.    The Named Plaintiffs do not have statutory standing to seek relief. ............. 28

            2.    Nor are the Named Plaintiffs typical of the proposed classes. ..................... 29

V.    Conclusion ....................................................................................................... 30

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re 5-Hour Energy Mktg. & Sales Pracs. Litig.*,
2017 WL 2559615 (C.D. Cal. June 7, 2017) .......................................................13, 20, 21, 22

*Astiana v. Kashi Co*.,
291 F.R.D. 493 (S.D. Cal. 2013) ...........................................................................13

*Backhaut v. Apple, Inc.*,
74 F. Supp. 3d 1033 (N.D. Cal. 2014) ...................................................................28

*Becerra v. Dr Pepper/Seven Up, Inc.*,
945 F.3d 1225 (9th Cir. 2019) ................................................................................19

*Blough v. Shea Homes, Inc*.,
2014 WL 3694231 (W.D. Wash. July 23, 2014) ....................................................24

*Brown v. Am. Airlines, Inc*.,
285 F.R.D. 546 (C.D. Cal. 2011) ...........................................................................23

*Bustamante v. KIND, LLC*,
100 F.4th 419 (2d Cir. 2024) .................................................................................13

*Cabral v. Supple LLC*,
608 F. App'x 482 (9th Cir. 2015) .....................................................................11, 15

*Chuang v. Dr. Pepper Snapple Grp., Inc*.,
2017 WL 4286577 (C.D. Cal. Sept. 20, 2017) ......................................................14

*Comcast v. Behrend*,
569 U.S. 27 (2013).................................................................................12, 25, 26, 27

*In re ConAgra Foods*,
302 F.R.D. 537 (C.D. Cal. 2014).............................................................................26

*Converse v. Vizio, Inc.*,
2020 WL 729804 (W.D. Wash. Feb. 13, 2020).....................................................24

*Davidson v. Apple, Inc.*,
2018 WL 2325426 (N.D. Cal. May 8, 2018)...........................................................11

*Donohue v. Apple, Inc.*,
871 F. Supp. 2d 913 (N.D. Cal. 2012) ...................................................................28

*Dunn v. Costco Wholesale Corp.*,
2021 WL 4205620 (C.D. Cal. July 30, 2021) ........................................................22

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011) .................................................................................10, 11, 12, 29

*Fitzhenry-Russell v. Keurig Dr. Pepper Inc.*,
    345 F. Supp. 3d 1111 (N.D. Cal. 2018) ..................................................................................14

*Geier v. M-Qube Inc.*,
    314 F.R.D. 692 (W.D. Wash. 2016) ...................................................................................11, 24

*Gross v. Vilore Foods Co.*,
    2022 WL 1063085 (S.D. Cal. Apr. 8, 2022)...........................................................................20

*Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*,
    105 Wash. 2d 778 (1986).................................................................................................11, 16

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992) ..................................................................................................29

*Helde v. Knight Transp., Inc.*,
    2013 WL 5588311 (W.D. Wash. Oct. 9, 2013) .......................................................................24

*Henderson v. Gruma Corp.*,
    2011 WL 1362188 (C.D. Cal. Apr. 11, 2011) .........................................................................15

*Herron v. Best Buy Stores, LP*,
    2018 WL 1960659 (E.D. Cal. Apr. 26, 2018)..........................................................................26

*Hinojos v. Kohl's Corp.*,
    718 F.3d 1098 (9th Cir. 2013), *as amended on denial of reh'g and reh'g en banc*
    (July 8, 2013) ..........................................................................................................................28

*Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc.*,
    162 Wash. 2d 59 (2007)....................................................................................................11, 23

*Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms.,
    Inc.*,
    19 F.3d 125 (3d Cir. 1994)......................................................................................................19

*Jones v. ConAgra Foods, Inc.*,
    2014 WL 2702726 (N.D. Cal. June 13, 2014) ............................................................... *passim*

*Kelley v. Microsoft Corp.*,
    2011 WL 13353905 (W.D. Wash. May 24, 2011).....................................................................24

*Kelley v. Microsoft Corp.*,
    251 F.R.D. 544 (W.D. Wash. 2008), *certification withdrawn*, 2009 WL 413509
    (W.D. Wash. Feb. 18, 2009) ...................................................................................................24

– ii –

*Kumar v. Salov N. Am. Corp.*,
2016 WL 3844334 (N.D. Cal. July 15, 2016)...........................................................22

*Larsen v. Vizio, Inc.*,
2017 WL 11633132 (C.D. Cal. Apr. 27, 2017) ..................................................25, 26

*Lavie v. Procter & Gamble Co.*,
105 Cal. App. 4th 496 (2003) ..................................................................................11

*Lewis v. Casey*,
518 U.S. 343 (1996)..................................................................................................28

*Leyva v. Medline Indus. Inc.*,
716 F.3d 510 (9th Cir. 2013) ....................................................................................25

*Lierboe v. State Farm Mut. Auto. Ins. Co.*,
350 F.3d 1018 (9th Cir. 2003) ..................................................................................28

*McMorrow v. Mondelez Int'l, Inc.*,
2020 WL 1157191 (S.D. Cal. Mar. 9, 2020) ............................................................25

*Moore v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC*,
2024 WL 348821 (N.D. Cal. Jan. 30, 2024) .......................................................18, 27

*Mut. Pharm. Co. v. Ivax Pharms., Inc.*,
459 F. Supp. 2d 925 (C.D. Cal. 2006) ......................................................................19

*NEI Contracting & Eng'g, Inc. v. Hanson Aggregates Pac. Sw., Inc.*,
926 F.3d 528 (9th Cir. 2019) ....................................................................................28

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) (en banc) ...................................................1, 10, 11, 12

*Ono v. Head Racquet Sports USA, Inc.*,
2016 WL 6647949 (C.D. Cal. Mar. 8, 2016).............................................................22

*Opperman v. Kong Techs., Inc.*,
2017 WL 3149295 (N.D. Cal. July 25, 2017)......................................................15, 26

*Pierce-Nunes v. Toshiba Am. Info. Sys., Inc.*,
2016 WL 5920345 (C.D. Cal. June 23, 2016) ..........................................................13

*Red v. Kraft Foods*,
2012 WL 5504011 (C.D. Cal. Oct. 25, 2012)...........................................................14

*Romero v. Flowers Bakeries, LLC*,
2016 WL 469370 (N.D. Cal. Feb. 8, 2016) ..............................................................14

*Roper v. Big Heart Pet Brands, Inc.*,
510 F. Supp. 3d 903 (E.D. Cal. 2020)...................................................................4, 23

*Schnall v. AT&T Wireless Services, Inc.*,
　171 Wash. 2d 260 (2011).........................................................................24

*Spacone v. Sanford, L.P.*,
　2018 WL 4139057 (C.D. Cal. Aug. 9, 2018)...........................................30

*Stearns v. Ticketmaster Corp.*,
　655 F.3d 1013 (9th Cir. 2011) ......................................................11, 20, 29

*Townsend v. Monster Beverage Corp.*,
　303 F. Supp. 3d 1010 (C.D. Cal. 2018) ............................13, 20, 25, 26

*Turcios v. Carma Lab'ys, Inc.*,
　296 F.R.D. 638 (C.D. Cal. 2014) ...........................................................28

*Vizcarra v. Unilever United States*,
　339 F.R.D. 530 (N.D. Cal. 2021) ............................................... *passim*

*Wal-Mart Stores, Inc. v. Dukes*,
　564 U.S. 338 (2011)..............................................................10, 11, 12

*Waller v. Hewlett-Packard Co.*,
　295 F.R.D. 472 (S.D. Cal. 2013) ...........................................................16

*Weidenhamer v. Expedia, Inc.*,
　2015 WL 7157282 (W.D. Wash. Nov. 13, 2015).......................15, 23, 24

*William H. Morris Co. v. Grp. W, Inc.*,
　66 F.3d 255 (9th Cir.), *supplemented sub nom. William H. Morris Co. v. Grp. W.
　Inc.*, 67 F.3d 310 (9th Cir. 1995) ............................................................19

*Williams v. Gerber Prods. Co.*,
　552 F.3d 934 (9th Cir. 2008) .................................................................11

*Zakaria v. Gerber Prod. Co.*,
　755 F. App'x 623 (9th Cir. 2018) ..........................................................27

**Statutes**

California's False Advertising Law ...............................................................1

California Unfair Competition Law ...............................................1, 28, 29

Washington's Consumer Protection Act............................................ *passim*

**Other Authorities**

21 C.F.R. § 102.5 ........................................................................................5

21 C.F.R. § 501.4 ........................................................................................5

– iv –

21 C.F.R. § 501.100 ........................................................................................................5

Fed. R. Civ. P. 23 ...............................................................................................1, 10, 11

Fed. R. Civ. P. 23(a) .................................................................................................10, 12

Fed. R. Civ. P. 23(a)(2) ............................................................................................11, 12

Fed. R. Civ. P. 23(a)(3) ....................................................................................................29

Fed. R. Civ. P. 23(b) ........................................................................................................10

Fed. R. Civ. P. 23(b)(3) .............................................................................................11, 12

McCarthy on Trademarks and Unfair Competition § 32:193 (5th ed.) .........................19

Shari Seidman Diamond, *Reference Guide on Survey Research, Reference Manual on
    Scientific Evidence* 249 (Fed. Jud. Ctr. 3d ed. 2011) .............................................17

U.S. Const., art. III..........................................................................................................28

# I.    INTRODUCTION

Plaintiffs' Motion for Class Certification ("Motion") fails to provide any evidence to "actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664 (9th Cir. 2022) (en banc). Plaintiffs have accused Defendants of falsely representing that avocado is a "main ingredient" in AvoDerm, and they seek to certify a class, or subclasses, of California and Washington consumers who purchased AvoDerm dry dog and cat food "on the theory that Defendants misrepresent the Products as containing significantly more avocado than the *de minimus* [sic] amount of 'meal/powder' there actually is." Mot. 3. Setting aside this internal contradiction—"main ingredient" versus "more [] than *de minimus* [sic] amount," which have entirely different meanings—there is no evidence to support the notion that Defendants make any representation about the amount of avocado in AvoDerm. Notably, Plaintiffs have waffled around, retreating from their flawed main ingredient theory pleaded in their Third Amended Complaint ("TAC"), attempting to redefine it in their discovery responses, class certification motion, and expert reports, with no fewer than 15 different descriptions, all with substantially different meanings. Based on the lack of evidence needed to prove their claims and the numerous individualized issues and flaws outlined below, the Motion should be denied.

The premise of Plaintiffs' case is that Defendants should not have been allowed to advertise the fact that AvoDerm contains avocado and avocado oil, even though both of those ingredients were in fact included in AvoDerm. Plaintiffs' theory would have had Defendants remove any and all references to avocado on the packaging and in marketing materials, all of which are unrelated to the amount of avocado in AvoDerm. They argue that the mere presence of simple avocado imagery on the packaging or in marketing materials, and the truthful inclusion of avocado and avocado oil in the ingredient panel are somehow misleading. *See* Doc. 102, TAC at Fig. 3; Mot. 2–3. But avocado is an important distinguishing ingredient in AvoDerm; it is an expensive ingredient that provides unique health benefits and sets AvoDerm apart from its competitors. The proposition that Defendants cannot truthfully advertise that fact is wrong and unsupported by law.

Plaintiffs assert six (6) causes of action based on alleged violations of the California Consumers Legal Remedies Act ("CLRA"), the California Unfair Competition Law ("UCL"), California's

False Advertising Law ("FAL"), and Washington's Consumer Protection Act ("WCPA"), as well as unjust enrichment under both California and Washington law. *See* TAC. However, Plaintiffs are only seeking to certify Counts 1–3 and 5 of their TAC, meaning that they have seemingly abandoned their unjust enrichment claims for the purposes of class certification. They are also no longer pursuing their theory that Defendants misrepresented the California origin of the avocados in the Products and are instead seeking certification solely on their main ingredient theory.

## II.    BACKGROUND

### A.    The Products

Defendants manufactured, marketed, and sold a line of dog and cat food called AvoDerm (the "Products," or "AvoDerm") until December 2020, at which point they sold the business. *Id.* at ¶1; Suber Decl. ¶12, Exs. J–K.[1] Plaintiffs cannot credibly dispute the fact that AvoDerm contains both avocado and avocado oil in an amount greater than 1%.[2] The Products are all labeled with an ingredient panel that clearly and accurately indicates the order of the ingredients by weight, including the avocado and avocado oil. *See* TAC at Fig. 3; Mot. Ex. 4. Plaintiffs do not dispute the label's accuracy,[3] which is supported by Defendants' internal documents laying out the Products' formulas. Mot. Exs. 14–15. Defendants' representations that AvoDerm contains avocado and avocado oil are thus literally true.

### 1.    The amount of avocado in AvoDerm is meaningful and significant.

AvoDerm was formulated to provide a well-balanced, nutritious pet food product, and the amount of avocado in the formulation is no exception. As explained by Dr. Dennis Jewell, an expert in pet nutrition, "what is known to nutritionists is that ingredients are important not from their concentration in the total dietary mix but because of the nutrients supplied." Jewell Rep. 1. Dr. Jewell opined that, despite Plaintiffs' claims that the amount is *de minimis*, AvoDerm contains a significant amount of avocado. Dr. Jewell confirmed that the avocado in AvoDerm supplies "significant

---

[1] All exhibit cites are to the Declaration of Sean H. Suber, unless otherwise noted.

[2] While Plaintiffs claim that there is less than 1% of avocado in AvoDerm (*see* Mot. 2), this contention is false. Even looking solely at the face of Plaintiffs' Motion, AvoDerm's formula consists of 0.86–0.87% avocado powder and 0.2% avocado oil. *Id.; see also* Mot. Exs. 14–15. By their own admission, approximately 1.07% of the AvoDerm formulas is avocado powder and avocado oil.

[3] *See* Ex. A, Brand Dep. 218:25–219:4 ("**Q.** [Y]ou're not claiming that the ordering of the avocado and the avocado oil in this ingredient panel is incorrect in any way, are you? **A.** No.").

nutrients," including "protein, digestible carbohydrate, dietary fiber, fatty acids and biologically active components such as tocopherols and phytochemicals." *Id.* at 1. He opined that, "[t]hese nutrients, as part of a complement of nutrients in these complete and balanced dog and cat foods, provide the benefits of balanced nutrition." *Id.* at 7. He further opined that the avocado and avocado oil in AvoDerm "provide for overall health and support a healthy skin and coat." *Id.*

Dr. Jewell also explained that avocado is present in AvoDerm in an amount that "provide[s] the desired nutrition without pricing the whole food beyond what a consumer would pay for a pet food product." *Id.* at 1. Avocado is expensive, which makes its inclusion in AvoDerm so unique and distinguishable. *See* Mot. Ex. 14 (demonstrating that avocado is at least four times more expensive per pound than almost all the other ingredients in AvoDerm). No other pet food manufacturer uses avocado as a supportive ingredient to reach the food's necessary concentration of nutrients. *See* Mot. 6 (identifying avocado as "unique" to the AvoDerm brand); Ex. F, Mann Dep., 62:6–63:11 ("[H]aving avocado as an ingredient is unique to dog food during this time period ... we had it and other[s] do – did not[.]"). Here again, this renders claims by Defendants that avocado is a key or unique ingredient literally true. Defendants' branding embraces the fact that avocado is distinctive and included in an amount that significantly contributes to the Products' nutritional profile. It does not promise any specific percentage or amount of avocado in the Products. *See* Ex. B, Flodin Dep. 169:16–170:14, 177:22–178:9; Ex. A, Brand Dep. 137:6–141:14, 200:11–22, 220:24–221:20, 331:7–10.

## 2. AvoDerm contains "real" avocado and the labeling does not violate FDA regulations.

While Plaintiffs assert at times that there is no "real" avocado in AvoDerm, that theory was not pleaded in their TAC and is contradicted by the evidence.[4] As previously mentioned, it cannot be disputed that the Products contain avocado and avocado oil. Plaintiffs admit this in their Motion. Mot. 2. To the extent that Plaintiffs are arguing that the avocado powder used in the Products is not real

---

[4] To the contrary, Plaintiffs alleged in the TAC that the avocado meal/powder was problematic because it "consist[ed] of a small percentage of dried avocado flesh and the majority of the 'avocado' meal/powder is comprised of several other dried or dehydrated ingredients." TAC ¶2. They did not allege that the dried avocado wasn't real avocado; they simply alleged that there was a "very small percentage[], if any" of dried avocado in the meal/powder. *Id.* Now that this allegation has been wholly debunked, they are pivoting and claiming for the first time that dried avocado is not real avocado.

avocado, their assertion is nonsensical. The avocado powder consists entirely of pure, dried avocado flesh, without the pits or skins of the avocado. Ex. H, Ingredient Specifications; Horr Rep. 6 ("[The] avocado supplied by Elements and used by Avoderm in these formulas is in fact avocado."); Ex. F, Mann Dep. 204:7–18 ("We always used real avocados .... Avocado meal is real avocados."). There is a very minor amount of maltodextrin added to the avocado powder as a flowing agent (*See* Ex. I, Manufacturing Flow Chart), which is necessary in formulating the final product, but its addition does not somehow negate that the dried avocado flesh is avocado. Jewell Rep. 3, 7. To the contrary, Dr. Jewell confirms that dried avocado powder provides the same benefits as fresh avocado flesh—neither is more "real" than the other.[5] *Id.* at 7.

Plaintiffs offer no evidence in support of their claim that AvoDerm does not contain real avocado, aside from throwing up a smoke screen with out-of-context statements in emails from a regulatory employee, Lorri Chavez, who was not involved in the formulation of AvoDerm. Mot. 7–9; Chavez Decl. ¶3. Ms. Chavez clarified that she "did not mean that AvoDerm products do not contain avocado or that the avocado used in the products was somehow 'fake' avocado." Chavez Decl. ¶5. Instead, she was drawing a distinction in internal communications between avocado powder/meal and fresh avocado flesh, which she referred to in shorthand as "real avocado." *Id*. She was not denigrating the inclusion of avocado powder as fake avocado, as Plaintiffs would have this Court believe. And importantly, the context of her recommendations regarding the AvoDerm labeling was based on voluntary *guidelines* issued by the Association of American Feed Control Officials ("AAFCO") and not state or federal law. *Id.* ¶¶7–8; *See Roper v. Big Heart Pet Brands, Inc.,* 510 F. Supp. 3d 903, 914 (E.D. Cal. 2020) ("AAFCO's guidelines are not an enforceable provision of California law").

Plaintiffs' argument that Defendants violated FDA regulations and non-binding AAFCO guidelines is a dead-end. The 2011 FDA letter they refer to involved the ingredient panel on a label for a discontinued cat food hair ball product that is not at issue in this case (*see* Doc. 102-3) and

---

[5] That Plaintiffs supposedly expected fresh avocado flesh in dry dog food shows a failure to understand the dry dog and cat food manufacturing process. Every ingredient in a pet food kibble is ultimately ground down, baked, and sold to consumers in dry pellets. Even if Plaintiffs did envision the inclusion of fresh avocado flesh, that flesh would be dried by the time Plaintiffs purchased AvoDerm. Plaintiffs fail to provide any rational argument as to the import of the avocado flesh being dried before it is added to the formula, as opposed to later as part of the manufacturing process.

suggested Defendants "correct the ingredient listing if necessary." Mot. Exs. 18–19. The reference to "dehydrated avocado meal with maltodextrins" was to AAFCO guidance, not FDA regulations, meaning that it was *not necessary* to correct the avocado ingredient listing, and FDA took no further action.[6] Plaintiffs' attempt to invoke unenforceable and non-binding AAFCO guidelines thus fails.

Defendants' expert, Taryn Horr, M.S., CHS, CCFS, has extensive knowledge about regulatory compliance requirements for pet foods and opines that "the listing of the avocado meal powder as avocado in the ingredients is technically factual" and "do[es] not violate any of the FDA labeling regulations." Horr Rep. 5–6. Further, both California and Washington "require submittal and approval of representative labels before providing a license to manufacture or sell pet food," meaning these state regulators "would have reviewed all AvoDerm labels and approved them before they began selling in these states." *Id.* at 6. Finally, she opines that Defendants are "under no obligation to abide by AAFCO's Model Regulations" because "AAFCO has no regulatory authority and its model regulations are just that, models." *Id.*

## B.   The Alleged Misrepresentations and Central Questions

Plaintiffs accuse Defendants of "falsely represent[ing] that avocado is a main ingredient in AvoDerm." Mot. 3; *see also* TAC ¶¶9, 12, 18, Fig. 3. But the notion that avocado is a main ingredient, and the plethora of different and contradictory terms Plaintiffs use to describe their theory, comes from whole cloth. Plaintiffs were forced to face the fact that their theory was fatally flawed in an exchange at a discovery hearing when the Court notified Plaintiffs, "I don't even know what [main ingredient] means ... You need to deal with what you mean by main." Ex. G, Hr'g Tr. 6:23–7:15. Plaintiffs' actions have since made it painfully clear that not even they know what they mean by "main." Now stuck with a faulty theory pleaded in their TAC, Plaintiffs and their experts have engaged in a scattershot attempt to invent new and inconsistent meanings that fall apart under their own weight.

---

[6] These FDA regulations provide that the labels of animal food must list the ingredients "by common or usual name." 21 C.F.R. § 501.4. The "common or usual name" of the food "shall accurately identify or describe, in as simple and direct terms as possible, the basic nature of the food or its characterizing properties or ingredients." *Id.* § 102.5. Substances that are "added to a food for their technical or functional effect in the processing but are present in the finished food at insignificant levels and do not have any technical or functional effect in that food," such as the maltodextrin in the avocado powder, are exempt from these labeling requirements. *Id.* §§ 501.4, 501.100.

Plaintiffs have never provided any consistent or clear definition as to the meaning of main ingredient. They have indiscriminately substituted the term with "key ingredient," "principal ingredient," "principal amount," "top ingredient," "chief ingredient," "more avocado than the *de minimus* [sic] amount," and "appreciable amount (significantly more than 1%)," ignoring that each of those terms has different meaning.[7] *See e.g.*, TAC at ¶¶7, 9, 41, 42; Mot. 2, 10; Doc. 171-36, Flodin Decl. at ¶¶5–7. In their Motion, Plaintiffs again change their story, arguing that Defendants' representations are false if "avocado and avocado oil do not even represent more than 5%" (Mot. 4), without explaining where this arbitrary 5% threshold comes from. Plaintiff Brand testified that a main ingredient was at least 10% of the total formula but agreed that a main ingredient could instead simply be "special" or "different" than ingredients found in other pet foods. Brand Dep. 216:1–11, 237:14–238:3. Plaintiff Flodin testified that a main ingredient was a "top ten ingredient" and admitted that he "d[idn't] know a certain percentage" necessary to constitute a main ingredient. Flodin Dep. 182:22–183:10. He then contradicted his own testimony when he said that avocado needed to be "more than 1 percent" and "between, like, 15 and 20 percent" of the formula. *Id.* at 226:12–19, 230:7–15. Plaintiffs admit this definition is not a defined number and "significantly more than 1%" could range anywhere from 1.5% to 99%. *Id.* at 226:17–227:13; Brand Dep. 292:25–293:13, 309:20–310:3.

Plaintiffs' experts have introduced even more confusion into the definition. Their survey expert, Robert Klein, testified that "[w]hether I call it 'main ingredient' … is irrelevant" (Ex. E, Klein Dep. 69:7–9) and tested what he understood to be Plaintiffs' theory based on the totality of the AvoDerm packaging. *Id.* at 115:1–6 ("**Q.** [T]he misleading impression that you were trying to measure based on the totality of the entire package of AvoDerm that you showed to respondents, that being the front, the sides, and the back of the package, right? **A.** Correct"). Their damages expert Colin Weir and conjoint survey expert Steven Gaskin, however, defined the alleged misrepresentation entirely differently. Gaskin and Weir distilled the alleged misrepresentations down to the phrase "made with avocado … based on the findings of Mr. Klein's survey." Ex. D, Gaskin Dep. 34:18–21; 68:21–24

---

[7] The TAC itself makes clear that these terms have varied meanings. TAC ¶8 ("The term 'key' is defined as 'extremely or crucially important' ... The adjective 'top' means 'of the highest quality, amount, or degree.'"). Plaintiffs agreed that these terms did not have the same meaning during their depositions. Brand Dep. 179:17–181:1, 186:15–20; Flodin Dep. 213:15–215:24.

("**Q.** What's the misrepresentation that you're measuring? **A.** [I]t's the net impression that the class products are made with avocado."). Klein, however, testified that the phrase is not false. Klein Dep. 108:23–109:1 ("**Q.** There's nothing false about the phrase 'made with avocado' as far as you're concerned, right? **A.** I don't consider it false, no."). Weir, who relied on and helped design and evaluate the Gaskin survey (Weir Decl. ¶9), similarly testified that the phrase Made with Avocado "certainly doesn't specify an amount." Ex. C, Weir Dep. 227:4–6. Weir conceded, "I understand that Plaintiffs assert that the reasonable consumer would take away that there would be more avocado in the product than there actually is. But I'm not offering opinions as to the amounts." *Id.* at 226:24–227:3.

Central to this case is what, if anything, Defendants convey about the amount of avocado in AvoDerm, and where that is conveyed.[8] But because neither the label, nor any advertising, states anything about the amount of avocado in AvoDerm, Plaintiffs have blurred the lines by confusing literal communications about the avocado in AvoDerm (i.e., avocado's truthful inclusion in the ingredient panel) and the implied message Plaintiffs believe is imparted by representations made on the bag, in online statements, and in internal documents (i.e., avocado as a main ingredient). *See* TAC ¶¶12–13, 18–19. Yet they strategically ignore many of those sources when it is more convenient to limit the alleged misrepresentations to the AvoDerm packaging. *See* Mot. 12 (arguing class-wide exposure to "the Avocado Misrepresentations that were uniformly labeled on the front (and back) of every Product"). However, they have failed to connect any statements to the amount of avocado in the Products or what Plaintiffs and class members uniformly saw when making their purchases.

In their Motion, Plaintiffs claim that Defendants' misrepresentations included: "(i) avocado as part of the *Avo*Derm brand name; (ii) logo that has an avocado as the 'o' in AvoDerm; (iii) affirmative statements that the Products are made 'with avocados' accompanied by an image of an avocado; and

---

[8] Plaintiffs' case has been riddled with problems on these points from the outset. They began arguing that there was too much foreign avocado in AvoDerm to support their claim that the "Made in USA Claim" on the package was false. *See, e.g.*, Doc. 56, Second Am. Compl. ¶8 ("Given that avocado is listed among the most predominant ingredients in AvoDerm products, Defendants have admitted that avocado makes up a significant percentage of AvoDerm products, and certainly more than 5% of the final wholesale value of the AvoDerm cat and dog food products.") (emphasis added). At the same time, they alleged that there was "little to no avocado at all" in AvoDerm. *See* Doc. 1, Compl. ¶2. Plaintiffs' "Made in USA" claim was dismissed by this Court several times, so they pivoted to their main ingredient theory. *Compare* Doc. 1, Compl. ¶2 *with* Doc. 56, Second Am. Compl. ¶2.

(iv) an avocado grove across the top of the packaging[.]" Mot. 3–4 (the "Alleged Avocado Misrepresentations"). Notably, not a single element of the Alleged Avocado Misrepresentations says anything about the amount of avocado in AvoDerm. *See* Klein Dep. 97:24–98:3 ("**Q.** Now, do any of the statements that we just identified via those [four] romanettes say anything about the amount or quantity of avocado in AvoDerm? **A.** No, they don't."), 91:13–15 ("**Q.** Does the term 'main ingredient' say anything about the quantity of avocado in AvoDerm? **A.** No").

While Plaintiffs' experts all acknowledged this definition of the Alleged Avocado Misrepresentations (Doc 171-36, Klein Rep. ¶9; Doc. 171-37, Gaskin Decl. ¶8), none of them attempted to measure the impact of the actual statements and images at issue. Klein's survey attempted to measure consumer perception of the entirety of the AvoDerm packaging, which includes numerous representations that are not at issue in this litigation.[9] Klein Dep. 115:1–6 ("**Q.** [Y]ou were trying to measure based on the totality of the entire package … **A.** Correct"); Mot. Ex. 4. However, Gaskin and Weir attempted to measure the damages flowing only from the attorney-invented phrase Made with Avocado. Gaskin Dep. 51:18–21 ("**Q.** So where did the phrase 'made with avocado' come from? **A.** It was given to me by counsel based on Mr. Klein''s work[.]"); Gaskin Decl. ¶55 n.4. But this phrase is disconnected from Plaintiffs' theory and Klein's findings as it is not among the Alleged Avocado Misrepresentations and does not appear on any AvoDerm packaging. Klein Dep. 108:10–13 ("**Q.** The phrase 'made with avocado' doesn't appear anywhere on the package, does it? **A.** That specific phrase does not appear on the package"); Mot. 3–4; Mot. Ex. 4. And Gaskin concedes that it "does not give a quantitative amount" (Gaskin Dep. 132:2–3), which is the lynchpin of Plaintiffs' entire case.

The undisputed facts confirm that Defendants never claim that avocado is a main ingredient in AvoDerm, and Plaintiffs cannot point to any misleading statements made by Defendants as to the amount of avocado in the Products.[10] Mot. 3–4; TAC  ¶¶12, 18; Brand Dep. 135:6–9, 140:7–10 ("**Q.**

---

[9] The fact that Klein utilized what he calls a "natural control" in his survey—showing his control group bags of "Lucy Pet" food, an entirely different pet food brand and package (Klein Rep. ¶28)—means that he did not actually isolate and test the Alleged Avocado Misrepresentations. *See, e.g.*, *Vizcarra v. Unilever United States*, 339 F.R.D. 530, 540 (N.D. Cal. 2021).

[10] At most, on Defendants' website, it was represented that avocado is a "Top 10 Ingredient." TAC at Fig. 3. But the Court has held that "[n]othing about this ingredient order compels (or even supports)

[Defendants do not] use any term that's synonymous with main or principal on the package, right? **A.** I don't believe it does. … **Q.** [Y]ou don't see anything here about the principal or main ingredient being avocado; is that right? **A.** Correct."). Moreover, to the extent that Defendants' representations imply anything about the amount of avocado in AvoDerm (which they do not), Plaintiffs have no evidence that reasonable consumers would attach any importance to the amount when making their purchase decision. Plaintiffs' lack of evidence and Defendants' uncontroverted evidence defeat the requirements needed to certify a class.

### C.    The Named Plaintiffs

Aaron Brand is a resident of California and seeks to represent the proposed California class. TAC  ¶11; Mot. 17. He contends that he bought a 30-pound bag of AvoDerm Natural Adult Chicken Meal & Brown Rice Formula Dry Dog Food from Amazon.com on or around January 12, 2019. TAC ¶11. He testified that he purchased AvoDerm after reading "some articles" that stated that avocado was "helpful for dog's skin and general health overall." Brand Dep. 56:5–11. He purchased the product because he found the packaging "attractive" and because the product was made with local avocados. *Id.* at 58:25–59:10. After feeding his dog AvoDerm for a week, he claims he was unhappy because his dog's skin condition had not noticeably improved. *Id.* at 44:14–25. He was not unhappy about the form or amount of avocado in the product he purchased until he spoke with counsel, at which point he claims to have "found out there was more." *Id.* at 46:1–14.

Brand's testimony highlights the absurdity of Plaintiffs' case. He testified that the AvoDerm packaging does not make "any representations about principal or main ingredient" or the percentage of avocado in the formula. *Id.* at 135:6–9, 138:22–141:14. He agreed that the "Avo" and the "O" on the packaging would both be truthful if the product contained avocado. *Id.* at 213:16–25. He also agreed that a main ingredient could simply be "special" or "different" than ingredients found in other pet foods. *Id.* at 216:1–11. Brand further testified that the form of avocado in AvoDerm did not matter to him. *Id.* at 151:18–24. He testified he would consider avocado powder in AvoDerm to be "real avocado" if it included the "dried flesh of the avocado." *Id.* at 144:9–18, 145:8–22.

the conclusion that a particular ingredient constitutes any specific percentage of the product—by value, weight, or any other metric." Doc. 96, Order 2.

1    John Flodin is a resident of Washington and seeks to represent the proposed Washington class.

2    TAC ¶17; Mot. 17. He contends that he bought a four-pound bag of AvoDerm Natural Puppy Chicken

3    Meal & Brown Rice Formula Dry Dog Food from Amazon around August 28, 2020. TAC ¶17. He

4    testified that he purchased AvoDerm because he "was just looking for dog food that [he] thought

5    would be healthy for [his] dog" and because of "the California avocados that [he] thought were sig-

6    nificantly in th[e] product." Flodin Dep. 93:4–9, 95:2–11. He testified that he "assumes" he saw online

7    advertising for AvoDerm, but he could not recall whether he visited the AvoDerm website. *Id.* at

8    92:20–22, 102:1–20. He also testified that he "wasn't relying on the package" because he purchased

9    his product online. *Id.* at 175:8–11. He never opened the product or fed it to his dog. *Id.* at 112:18–21.

10   He claims he "heard about [the lawsuit] online," but was unable to provide any specific details about

11   when or where this occurred. *Id.* at 111:16–21, 119:2–16.[11]

12   Flodin testified that avocado would be a main ingredient in AvoDerm if it was a "top ten"

13   ingredient (which it is). *Id.* at 183:8–10. When asked if there was a particular percentage of avocado

14   needed to be considered a main ingredient, he testified that he "[didn't] know a certain percentage."

15   *Id.* at 182:22–183:7. Flodin also testified that the "Avo" in AvoDerm and the "O" on the packaging

16   do not imply anything about the amount of avocado in AvoDerm. *Id.* at 169:16–170:14.

### III.   LEGAL STANDARD

18   Plaintiffs must "actually *prove*—not simply plead—that their proposed class satisfies each re-

19   quirement of Rule 23 ... and must carry their burden of proof 'before class certification.'" *Olean*, 31

20   F.4th at 664. A class may be certified only if Plaintiffs meet "all of the requirements of Rule 23(a)"

21   and at least one of Rule 23(b)'s requirements. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 978–80

22   (9th Cir. 2011). To certify a class, the Court must conduct a "rigorous analysis" to determine if the

23   prerequisites of Rule 23 have been satisfied. *Olean*, 31 F.4th at 664. This requires a "rigorous assess-

24   ment" of the evidence and the "methods by which plaintiffs propose to use the [class wide] evidence

25   to prove" their case." *Id.* at 666. This rigorous analysis often entails "some overlap with the merits."

26   *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). Indeed, the Court "*must* consider the merits

---

[11] Plaintiffs have refused to produce this information in discovery. *See* Doc. 117 at 2–3, 5.

1    if they overlap with" Rule 23's requirements. *Ellis*, 657 F.3d at 981. And this also applies for "expert

2    evidence," and "may include '[w]eighing conflicting expert testimony' and '[r]esolving expert dis-

3    putes' where necessary[.]" *Olean*, 31 F.4th 666. Indeed, when it comes to proving commonality and

4    predominance requirements under Rules 23(a)(2) and 23(b)(3), the inquiry is not whether the plaintiffs

5    *say* they can resolve the case with common proof; it is whether the proffered evidence will *in fact*

6    "advance [movant's] case" and provide an "answer" to the relevant legal inquiry. *See Dukes*, 564 U.S.

7    at 354. Plaintiffs fall far short of these standards here.

8        "[C]onsidering whether 'questions of law or fact common to class members predominate' be-

9    gins, of course, with the elements of the underlying cause of action." *Olean*, 31 F.4th at 665. Plaintiffs'

10   California consumer protection claims all require them to prove that the Alleged Avocado Misrepre-

11   sentations are likely to deceive a reasonable consumer, meaning that that "it is probable that a signif-

12   icant portion of the general consuming public or of targeted consumers, acting reasonably in the cir-

13   cumstances, could be misled." *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008);

14   *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 508 (2003). The Washington consumer pro-

15   tection claim requires Plaintiffs to show that "alleged act had the capacity to deceive a substantial

16   portion of the public." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash. 2d

17   778, 785 (1986). For all these claims, it is also "critical that the misrepresentation in question be made

18   to all of the class members." *Cabral v. Supple LLC*, 608 F. App'x 482, 483 (9th Cir. 2015); *Davidson

19   v. Apple, Inc.*, 2018 WL 2325426, at *17 (N.D. Cal. May 8, 2018). These claims all require Plaintiffs

20   to demonstrate reliance and causation, which can only be presumed under California law if the mis-

21   representation is material. *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022 (9th Cir. 2011). A rep-

22   resentation is material if a "reasonable man would attach importance to its existence or nonexistence

23   in determining his choice of action in the transaction in question." *Id.* Importantly, there is no such

24   presumption of reliance and causation under Washington law for WCPA claims based on affirmative

25   misrepresentations, regardless of whether the alleged misrepresentation is material. *Geier v. M-Qube

26   Inc.*, 314 F.R.D. 692, 700 (W.D. Wash. 2016). Thus, for their WCPA claim, Plaintiffs must "establish

27   that, but for the defendant's unfair or deceptive practice, [they] would not have suffered an injury."

28   *Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc*., 162 Wash. 2d 59, 83 (2007). Plaintiffs

1  have fallen far short of the required common evidence for any of these elements.

2  **IV.    ARGUMENT**

3  **A.    There is no evidence of class-wide deception, reliance, or causation.**

4  The classes cannot be certified unless Plaintiffs prove they meet Rule 23(a)(2)'s "commonal-

5  ity" requirement that "there are questions of law or fact common to the class." *Ellis*, 657 F.3d at 980.

6  The common contention "must be of such a nature that it is capable of classwide resolution—which

7  means that determination of its truth or falsity will resolve an issue that is central to the validity of

8  each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. Closely related to commonality, but

9  "even more demanding," is Rule 23(b)(3)'s requirement to prove that "questions of law or fact com-

10  mon to class members predominate over any questions affecting only individual members." *Comcast*

11  *v. Behrend*, 569 U.S. 27, 33–34 (2013). "The requirements of Rule 23(b)(3) overlap with the require-

12  ments of Rule 23(a): the plaintiffs must prove that there are 'questions of law or fact common to class

13  members' that can be determined in one stroke in order to prove that such common questions predom-

14  inate over individualized ones." *Olean*, 31 F.4th at 664. Courts therefore "must consider cases exam-

15  ining both subsections in performing a Rule 23(b)(3) analysis." *Id.*

16  Here, Plaintiffs have not proven commonality or predominance can be established with com-

17  mon proof. They have not shown any method of proving that the Alleged Avocado Misrepresentations:

18  (1) were uniform in meaning that avocado was a main ingredient (a phrase that Plaintiffs' lawyers

19  have invented) and a uniform understanding of the same; (2) were exposed to the putative class mem-

20  bers; (3) deceived reasonable consumers; (4) were material to class members' purchase decisions; or

21  (5) were the "but-for" cause of the class members' alleged injuries (for the Washington Class).

22  **1.    Plaintiffs fail to establish a controlling definition and uniform**
           **understanding for the phrase main ingredient or the Alleged Avocado**
23         **Misrepresentations.**

24  Individualized issues predominate the deception and materiality analyses because Plaintiffs

25  failed to provide a controlling definition for the phrase main ingredient or show that consumers have

26  a uniform understanding of the Alleged Avocado Misrepresentations. Where Plaintiffs "fail to estab-

27  lish a controlling definition for a key term in an alleged misstatement" and/or "offer no evidence that

28  the majority of consumers, or even a substantial group of consumers ... believe that [the at-issue

– 12 –

representations] mean[] only one thing," neither materiality nor deception are susceptible to common proof. *In re 5-Hour Energy Mktg. & Sales Pracs. Litig.*, 2017 WL 2559615, *8 (C.D. Cal. June 7, 2017) (individual issues predominate because "the meaning of the term 'energy' is disputed, and Plaintiffs have offered no evidence of a common definition of 'energy' among a substantial number of consumers."); *Vizcarra*, 339 F.R.D. at 547 (no common proof of deception where alleged misrepresentations were "inherently ambiguous" and had "no 'fixed meaning.'"); *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1045 (C.D. Cal. 2018) ("[p]laintiffs fail to make a satisfactory showing" of materiality in part because they "do not establish that the [hydrates like a sports drink] statement has a common meaning"); *Astiana v. Kashi Co.*, 291 F.R.D. 493, 508 (S.D. Cal. 2013) ("Plaintiffs fail to sufficiently show that 'All Natural' has any kind of uniform definition among class members. ... Even the named plaintiffs disagree about the definition ... and over whether the challenged ingredients fail to satisfy their expectations[.]"); *Jones v. ConAgra Foods, Inc.*, 2014 WL 2702726, at *15 (N.D. Cal. June 13, 2014) ("[E]ven if the challenged statements were *facially* uniform, consumers' *understanding* of those representations would not be ... there is no fixed meaning for the word 'natural.'"); *Pierce-Nunes v. Toshiba Am. Info. Sys., Inc.*, 2016 WL 5920345, at *7 (C.D. Cal. June 23, 2016) ("[Plaintiff] will not be able to demonstrate with common proof, even under a reasonable consumer standard, that each class member had the same understanding of the product labeling.").

The court in *Bustamante v. KIND, LLC* recently held that the plaintiffs failed to provide evidence of deception because they provided multiple, contradictory definitions of the term "All Natural" during their depositions and did not "explain how a trier of fact could apply these shifting definitions to reach a conclusion as to whether the use of the term 'All Natural' on [] product labels was deceptive." 100 F.4th 419, 432–34 (2d Cir. 2024). While plaintiffs provided examples of defendants' internal documents, which defined defendants' understanding of the term, the court rejected that evidence because the documents "[d]id not reveal a <u>reasonable consumer's</u> understanding of that term." *Id.* This reasoning is equally applicable here, because Plaintiffs have offered at least 15 different descriptions of main ingredient which can be interpreted in multiple different ways. *See supra* Section II.B.

While Plaintiffs claim that the Alleged Avocado Misrepresentations imply that avocado is a main ingredient or present in a particular amount (*see* Mot. 3–4), they have failed to establish that

– 13 –

1    other consumers agree with their subjective interpretation. Plaintiffs' consumer perception survey did

2    not test how consumers interpret the Alleged Avocado Misrepresentations, rather, it attempted to test

3    the entire packaging. Klein Dep. 115:1–6 ("**Q.** [Y]ou were trying to measure based on the totality of

4    the entire package ... **A.** Correct"). Klein never asked respondents whether the Alleged Avocado Mis-

5    representations implied anything about the amount of avocado, but instead forced them to guess a

6    percentage of avocado based on the full packaging. *Id.* at 122:2–8 ("**Q.** You could have asked a filter

7    question about quantity ... **A.** I could have, but did not feel it was necessary in this situation."). Klein

8    also did not believe the term main ingredient or the Alleged Avocado Misrepresentations "say any-

9    thing about the amount or quantity of avocado in AvoDerm." *Id.* at 91:13–15, 97:24–98:3.

10    Even Plaintiffs testified that they do not believe the Alleged Avocado Misrepresentations con-

11    vey anything about the amount of avocado in the Products. *See* Flodin Dep. 169:16–170:14 ("**Q.** The

12    name [AvoDerm] doesn't imply anything about the amount of avocado in the product, right? **A.** No….

13    **Q.** Okay. That 'O' doesn't imply anything about the amount of avocado in the product, correct? **A.**

14    Yeah. I don't believe that 'O' gives any impression of how many avocados are in that bag of dog

15    food."); Brand Dep. 212:18–213:25 ("**Q.** [T]he Avo in AvoDerm and the 'O' with the two leaves over

16    it could just signify that it's got avocado in it, right? **A.** Sure … **Q.** And if it does contain avocado,

17    then it's truthful, right? **A.** Yes."). And courts in this circuit frequently hold that similar representations

18    would not lead a reasonable consumer to believe anything about the amount of a particular ingredient.

19    *See e.g., Romero v. Flowers Bakeries, LLC*, 2016 WL 469370, at *7 (N.D. Cal. Feb. 8, 2016) ("[T]he

20    Court cannot agree … that the word 'wheat' combined with 'wholesome wheat' and 'healthy grains'

21    or 'Healthy White' alongside images of wheat stalks … could lead a reasonable consumer to conclude

22    that the breads 'contain a significant amount of whole wheat."); *Fitzhenry-Russell v. Keurig Dr. Pep-*

23    *per Inc.*, 345 F. Supp. 3d 1111, 1118 (N.D. Cal. 2018) ("'Made from Real Ginger' … makes no claims

24    as to the amount of ginger in Canada Dry."); *Chuang v. Dr. Pepper Snapple Grp., Inc*., 2017 WL

25    4286577, *4 (C.D. Cal. Sept. 20, 2017) (rejecting argument that "pictures of apples, pears, and carrots

26    alongside the text 'Made with real FRUIT and VEGETABLE juice' … suggests to consumers that the

27    fruit snacks contain significant amounts of the depicted fruits and vegetables[.]"); *Red v. Kraft Foods*,

28    2012 WL 5504011, at *4 (C.D. Cal. Oct. 25, 2012) ("[I]t strains credulity to imagine that a reasonable

– 14 –

consumer will be deceived into thinking a box of crackers … contains huge amounts of vegetables simply because there are pictures of vegetables and the true phrase 'Made with Real Vegetables' on the box."); *Henderson v. Gruma Corp.*, 2011 WL 1362188, at *12 (C.D. Cal. Apr. 11, 2011) ("'With Garden Vegetables' ... does not claim a specific amount of vegetables in the product[.]").

### 2.    Plaintiffs cannot demonstrate class-wide exposure.

Plaintiffs' Motion also must be denied because they do not establish class wide exposure to the alleged misrepresentations. For all of Plaintiffs' claims, "it is critical that the misrepresentation in question be made to all of the class members." *Cabral*, 608 F. App'x at 483; *see also Weidenhamer v. Expedia, Inc.*, 2015 WL 7157282, at *4 (W.D. Wash. Nov. 13, 2015). Therefore, "Plaintiffs must 'demonstrate[] that the class was exposed to the challenged marketing materials' in order to 'demonstrate commonality and predominance.'" *Opperman v. Kong Techs., Inc.*, 2017 WL 3149295, at *6 (N.D. Cal. July 25, 2017) (Tigar, J.).

Despite trying to cabin their focus in the Motion to the Alleged Avocado Misrepresentations, Plaintiffs do not limit their proposed class definitions to only consumers who were exposed to those alleged misrepresentations (Mot. 1), nor do they provide any evidence of class-wide exposure. Instead, they ask the Court to assume that class members were all "exposed to the Avocado Misrepresentations that were uniformly labeled on the front (and back) of every Product." Mot. 12. In doing so, they have again tried to inappropriately reframe their case by ignoring the representations that exclusively appeared online or in marketing materials, and they fail to account for the different ways consumers may have purchased the Products (i.e., online versus in-store).

Plaintiffs have pointed to numerous representations that allegedly led them to believe that avocado was a main ingredient (TAC ¶¶12–13, 18–19; Brand Dep. 253:17–254:6; Flodin Dep. 101:23–102:12), many of which are not located on the packaging of the Products and are instead located on the AvoDerm website, social media, or various e-commerce sites. Mot. 3–4; TAC ¶¶1, 8, 26, Figs. 2, 3. For example, Plaintiffs have frequently highlighted representations that "avocados are a key ingredient in AvoDerm recipes" (*see* TAC ¶8, Fig. 2), which do not appear anywhere on the Products' packaging. Mot. Ex. 4. Plaintiffs have provided no evidence that the proposed class members were uniformly exposed to these same representations. Plaintiffs have no evidence that in-store purchasers

viewed the AvoDerm website, social media, or other e-commerce sites prior to purchase.[12] And the online purchase experience would also vary drastically depending on the retailer where they purchased their Products. Some online retailers do not include the full product packaging on their websites, meaning that consumers who purchased Products from those online retailers would not have been exposed to, or relied upon, all the Alleged Avocado Misrepresentations that appear on the packaging.[13] Indeed, Plaintiff Flodin testified that he "wasn't relying on the package" because he purchased his product online. Flodin Dep. 175:8–11. Determining which online consumers were exposed to which representations "may well call for a website-by-website analysis," which is clearly "problematic" in the class certification context. *Waller v. Hewlett-Packard Co.*, 295 F.R.D. 472, 486–87 (S.D. Cal. 2013) (holding that "certification of a class of *all* ... purchasers is not appropriate" when online purchasers "may not have seen the representations at issue because website listings and descriptions vary").

### 3.    Plaintiffs do not show that deception is subject to common proof.

Plaintiffs' claims require proof that the Alleged Avocado Misrepresentations are likely to deceive a reasonable consumer. Mot. 16–17. This requires "more than a mere possibility that the [alleged misrepresentations] might conceivably be misunderstood by some few consumers viewing [them] in an unreasonable manner." *Vizcarra*, 339 F.R.D. at 544. Plaintiffs must provide evidence that "it is probable that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Id.*; *Hangman Ridge*, 105 Wash. 2d at 785.

Here, Plaintiffs have failed to provide any logical explanation as to why the Alleged Avocado Misrepresentations are misleading. They simply indicate that AvoDerm contains avocado, which it does. *See supra* Section II.A. Indeed, Plaintiffs testified that they did not believe the Alleged Avocado Misrepresentations necessarily implied anything about the amount of avocado in the Products, and they could not align on what amount should be present to constitute a main ingredient or if the amount is even relevant to them. *See* Flodin Dep. 182:22–183:10; Brand Dep. 212:18–213:25.

Plaintiffs assert that they can provide class-wide proof of deception with Klein's survey. Mot.

---

[12] *See* Brand Dep. 256:7–11 ("**Q.** [D]o you know if anybody purchasing AvoDerm at the store looked at any websites ... before purchasing AvoDerm dog food? **A.** I don't know.").

[13] For example, the retailer IncrediblePets does not include an image of the packaging's side or back panels. Ex. L.

19–20. In doing so, they egregiously misrepresent the results of Klein's survey by claiming that, of the respondents who believed AvoDerm was made with avocado, "more than 98% indicated the amount of avocado was 10% or greater." Mot. 20. In reality, of the respondents who reportedly believed the product was made with avocado, only 18.5% reported that they thought the amount of avocado in the products was 10% or greater. Klein Rep. 16, 19. When asked about this discrepancy, a flummoxed Klein confirmed that the 98% figure did not come from his report. Klein Dep. 174:16–176:1 ("**Q.** [Plaintiffs] say, 'Of those respondents, more than 98 percent indicated the amount of avocado was 10 percent or greater …' **A.** Yes. It doesn't – 98 percent doesn't look right … **Q.** [T]hey're apparently getting it from your survey, where did they get that from? **A.** Don't ask me … **Q.** [I]t's not in your report, is it? **A.** No, I don't believe it is."). Plaintiffs' 98% figure is a blatant falsehood.

Klein's survey also suffers from multiple fatal flaws that render it inadmissible and unreliable. *See* Mot. to Exclude Klein (incorporated herein by reference). First, it is entirely untethered from Plaintiffs' proffered theory of deception as it does not test whether consumers believe that the Alleged Avocado Misrepresentations imply that avocado is a main ingredient or present in any particular amount. Kivetz Rep. ¶¶42, 47. His survey instead asked respondents if they "believed the product package communicated that the product was made with avocado," and if they did, they were asked to guess "how much avocado (as a percentage of total weight of the product) do you think this pet food contains." Klein Rep. ¶¶12, 15, 53. But he missed a critical step by failing to include the necessary filter question to test whether the survey respondents even had an opinion about the amount of avocado in the Product. Kivetz Rep. ¶¶49–62; Poret Rep. 10–12. This is key, because "[s]ome survey respondents may have no opinion on an issue under investigation, either because they have never thought about it before or because the question mistakenly assumes a familiarity with the issue." Shari Seidman Diamond, *Reference Guide on Survey Research, Reference Manual on Scientific Evidence* 249 (Fed. Jud. Ctr. 3d ed. 2011); Kivetz Rep. ¶¶49, 54. Instead of including this filter question, Klein's survey assumes (without any evidence) that all respondents who believed the product package communicated that the product was made with avocado also believed the packaging communicated something about the amount of avocado. Kivetz Rep. ¶¶54, 56.

To make matters worse, Klein does not isolate the Alleged Avocado Misrepresentations, but

– 17 –

1    instead tested the entire AvoDerm packaging. Kivetz Rep. ¶¶46–47; Klein Dep. 113:19–22 ("**Q.** And

2    your purpose was to measure the meaning of the entirety of the package, right? **A.** The entirety of the

3    package was what was used as the stimulus."), 114:23–24 ("We weren't trying to isolate each of these

4    individual elements."). Courts hold that consumer perception surveys that fail to isolate the at-issue

5    representations, like Klein's, cannot be used as common proof of deception. In *Vizcarra*, for example,

6    the court held that the consumer perception survey was not common proof of deception because it "did

7    not specifically test the effect of the [at-issue representations] on consumers' expectations or beliefs;

8    instead, it tested the effect of *the entire package*, which contained the [at-issue] representations *as well*

9    *as* other statements and elements that are not at issue in this action." 339 F.R.D. at 546–47; *see also*

10   *Moore v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC*, 2024 WL 348821, at *6 (N.D.

11   Cal. Jan. 30, 2024) (consumer perception survey was not common proof because it "fail[ed] to suffi-

12   ciently isolate the Challenged Statements").

13           Although Klein used a control in his survey, the control was fatally flawed. Klein used a "nat-

14   ural control" (Lucy Pet dog and cat food packages) and did not minimize the differences between the

15   test stimulus and the control stimulus. Kivetz Rep. ¶84, 90; Klein Dep. 146:6–12. The differences

16   were numerous and striking—the products have different colors, different images, different names,

17   and different claims on the packaging. Kivetz Rep. ¶90; Klein Dep. 161:21–162:1, 166:21–1; Klein

18   Rep. App'x D at D-7 to D-8. This violates the fundamentals of survey research, because a proper

19   control group stimulus "shares as many characteristics with the experimental stimulus as possible,

20   with the key exception of the characteristic whose influence is being assessed." Diamond (2011) at

21   258; Kivetz Rep. ¶77. The control also eliminated *any* references to avocado, but avocado is present

22   in AvoDerm and Defendants must be able to truthfully state that. Kivetz Rep. ¶92; Klein Dep. 154:9–

23   22 ("**Q.** [W]here it says 'with omega-rich avocados,' you could have taken that off and said ingredients

24   include avocado powder and avocado oil, right? … **A.** I guess, that would be possible").

25           Defendants' survey expert, Hal Poret, designed a survey that remedied the most blatant prob-

26   lems with Klein's survey. Poret replicated the Klein survey with two key changes: (1) he added a

27   necessary filter question to assess whether respondents had formed any opinion regarding the quantity

28   of avocado in the product by percentage, and (2) he used a proper control that "removed all of the

– 18 –

allegedly deceptive packaging elements while holding constant all other elements and using an innoc-uous and plainly factual statement that: 'Ingredients include Avocado Powder and Avocado Oil.'" Poret Rep. 27. The results showed that "only 16.5% of Test Group respondents answered that the package caused them to form any opinion about the quantity of avocado, as compared to 11.8% in the Control Group," yielding a "net rate of 4.7%." *Id.* at 50. Then, when asked to input the amount of avocado by percentage, only 16% of Test Group respondents and 11% of Control Group respondents selected a figure of 1% or higher, yielding a net rate of 5.0%. *Id.* at 51. Based on these results, Poret opined "to a high degree of professional certainty that the allegedly deceptive elements of the AvoDerm packaging do not mislead consumers regarding the quantity of avocado in the product." *Id.* at 68; *see also Becerra v. Dr Pepper/Seven Up, Inc.,* 945 F.3d 1225, 1231 (9th Cir. 2019) (holding that survey showing "only 12.5 percent [of California consumers] expected diet soft drinks to help them lose weight" could not support a finding that a reasonable consumer would be deceived); *William H. Morris Co. v. Grp. W, Inc.,* 66 F.3d 255 (9th Cir.), *supplemented sub nom. William H. Morris Co. v. Grp. W. Inc.*, 67 F.3d 310 (9th Cir. 1995) ("Such a small percentage [3%] does not constitute proof that a significant portion of recipients were deceived."); *Mut. Pharm. Co. v. Ivax Pharms., Inc.,* 459 F. Supp. 2d 925, 946 (C.D. Cal. 2006) (survey results showing 11% respondents were deceived was insufficient to show that consumers were misled); *Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms., Inc.*, 19 F.3d 125, 133–34 (3d Cir. 1994) (7.5% of survey respond-ents being misled did not show that a "substantial portion of the intended audience" was deceived).[14]

Finally, to the extent that Plaintiffs take issue with the form of avocado in AvoDerm, arguing it is dried avocado in a powder form, they have not even attempted to provide common proof of de-ception. Klein "briefly references th[is] notion" in the background section of his report but is "other-wise silent on this issue [and] does not provide any evidence regarding such purported perceptions." Kivetz Rep. ¶43 n.68. In fact, Klein admitted that he did not ask participants about the form of avo-cado. Klein Dep. 78:1–79:3 ("**Q.** Did you try to test the consumer understanding of what you describe

---

[14] "Since the issue of likely customer deception from an allegedly false advertisement is closely analogous to the issue of likely confusion from an allegedly infringing mark, it is proper to use the percentage figures accepted in likelihood of confusion surveys." Klein Rep. ¶16 n.8 (citing McCarthy on Trademarks and Unfair Competition § 32:193 (5th ed.)).

here as the avocado in AvoDerm is actually an avocado meal/powder? **A.** No ... **Q.** [Y]our survey was not focused on assessing consumer understanding of the form of avocado in AvoDerm, right? **A.** No."). Since Klein's survey does not ask respondents whether they believe the avocado in the Products was fresh or dried, Plaintiffs have provided no common evidence that reasonable consumers would be deceived in this way. As discussed, avocado powder is real avocado; the fact that it is dried does not somehow negate that fact. *See supra* Section II.A.

### 4. Individual issues predominate because Plaintiffs have provided no common evidence of materiality.

Plaintiffs recognize that they must provide common evidence of materiality. Mot. 18–19. In other words, they must prove that "a reasonable man would attach importance to [the alleged misrep-resentations'] existence or nonexistence in determining his choice of action in the transaction in ques-tion." *Stearns*, 655 F.3d at 1022. To show materiality, it is critical that the plaintiff explain "*how* the challenged statements, together or alone, were a factor in ... consumer's purchasing decisions." *Jones*, 2014 WL 2702726, at *15; *Vizcarra*, 339 F.R.D. at 549–50 (same). Plaintiffs cannot make this show-ing "[a]bsent a consumer survey or other market research to indicate how consumers reacted to the [at-issue] statements, and how they valued these statements compared to other attributes of the product and the ... market generally." *In re 5HE*, 2017 WL 2559615, at *8. Plaintiffs have not provided any common evidence of materiality and are therefore not entitled to an inference of reliance or causation.

None of Plaintiffs' experts even attempted to analyze whether or to what extent the Alleged Avocado Misrepresentations factored into consumers' purchasing decisions. These opinions therefore cannot serve as common evidence of materiality. *See Jones*, 2014 WL 2702726 at *15 (no evidence of materiality where plaintiffs' expert "did not explain *how* the challenged statements, together or alone, were a factor in any consumer's purchasing decisions ... as opposed to, or in addition to, price, promotions, retail positioning, taste, texture, or brand recognition"); *Townsend*, 303 F. Supp. 3d at 1045 (no evidence of materiality where plaintiffs' expert's survey was "not tethered to consumer's purchasing behavior"); *Gross v. Vilore Foods Co.*, 2022 WL 1063085, at *7 (S.D. Cal. Apr. 8, 2022) (survey failed to evidence materiality where it "did not isolate the artificial flavoring as the partici-pant's reason for not purchasing" the beverages at issue and accordingly "provide[d] no way of

1    knowing what motivated" participants).

2          As explained in the Motions to Exclude Gaskin and Weir, they did not test how or if the amount

3    of avocado, as informed by the Alleged Avocado Misrepresentations, was a factor in consumers' de-

4    cisions to purchase the Products. *See* Gaskin Mot. Excl. 15–17; Weir Mot. Excl. 16–20; Gaskin Dep.

5    255:16–20 ("**Q.** [Y]our proposed conjoint survey is not a materiality survey, is it? **A.** Well, it's more

6    for overpayment of damages."). Nor did Klein. Klein Dep. 181:1–2 ("I wasn't asked to do a materiality

7    survey."). Yet Plaintiffs claim, without explanation, that Gaskin and Weir's "proposed conjoint survey

8    and damages calculation ... will also establish common evidence of materiality." Mot. 21. The only

9    mention of materiality in these reports is in the Weir Declaration, which claims that "[t]he results of

10   Mr. Gaskin's conjoint survey will also indicate whether the Claim is economically material to a rea-

11   sonable person" because "the finding of a change in market value would demonstrate that the Claim

12   is sufficiently economically material to cause a change in the Products' economic value." Weir Decl.

13   ¶46. But Gaskin's survey was designed only to "estimate[] the market price premium resulting from"

14   the phrase Made with Avocado, which never appeared on any packaging or advertising. Gaskin Decl.

15   ¶¶10, 45, 55 n.40. He makes no effort to isolate the Alleged Avocado Misrepresentations or test

16   whether they factored into consumers' purchasing decisions. Kivetz Rep. ¶100. To the contrary, he

17   testified that his role was to assume that the Alleged Avocado Misrepresentations were material. *Id.*

18   at 190:5–8. ("I'm here to assume the plaintiffs' theory of liability is true and that the avocado misrep-

19   resentation is material to consumers."). And what's more, Gaskin's phrase, Made with Avocado, does

20   not speak in any way to the amount of avocado in the Products—which is the crux of Plaintiffs' theory.

21   Gaskin Dep. 131:22–132:3 ("[Made with Avocado] does not give a quantitative amount"); Weir Dep.

22   227:4–6 ("[Made with Avocado] certainly doesn't specify an amount"). Considering his survey design

23   and his lack of expertise regarding materiality surveys, his proposed survey can *at most* indicate

24   whether there is a price premium attributable to the general presence of avocado in AvoDerm. *See*

25   Gaskin Dep. 256:17–257:9 ("[I]f that price premium is positive Mr. Weir states that that would mean

26   that the statement [Made with Avocado] is material to consumers."). This is entirely irrelevant here;

27   Plaintiffs must demonstrate that reasonable consumers find the amount of avocado material. *See In re*

28   *5HE*, 2017 WL 2559615, at *8; *Jones*, 2014 WL 2702726, at *15; *Vizcarra*, 339 F.R.D. at 550.

– 21 –

Again, Defendants' survey expert Poret filled in the gap left by Plaintiffs' experts. He designed and conducted a materiality survey to "test the extent to which the allegedly deceptive elements increase consumer likelihood of purchasing the product." Poret Rep. 5. As with his deception survey, Poret isolated the impact of the Alleged Avocado Misrepresentations by using the proper control. A total of 800 respondents reviewed either the AvoDerm or the control package and were asked (1) how likely they would be to purchase the product and (2) the reasons they would be likely or unlikely to purchase the product. *Id.* at 26–31. He found that "the presence or absence of the allegedly deceptive elements had no statistically significant impact on the consumer purchase decision." *Id.* at 5, 57–58. Further, "only 1.5% of respondents who saw the allegedly deceptive packaging answered that the quantity of avocado was a reason for being likely to purchase the product (or a net rate 0.7% after accounting for the Control Group result)." *Id.* at 5–6; *Ono v. Head Racquet Sports USA, Inc.,* 2016 WL 6647949, at *13 (C.D. Cal. Mar. 8, 2016) (individual questions predominate where defendant "produced [survey] evidence that only six percent of the relevant group of consumers" found alleged misrepresentations material); *In re 5HE*, 2017 WL 2559615, at *8 (class certification denied where Defendants' "survey found that only 2.2 percent of 5HE consumers attributed their initial purchase decision to 5HE's 'marketing efforts'"); *Dunn v. Costco Wholesale Corp.*, 2021 WL 4205620, at *5 (C.D. Cal. July 30, 2021) (no commonality where "a survey commissioned by [defendant] showed that only two percent of purchasers of the Product" found the alleged misrepresentation material).

None of the other supposed evidence Plaintiffs proffer can be used as common evidence of materiality. They argue that "the record is replete with internal documents from Defendants that establish that the Avocado Misrepresentations were material to AvoDerm consumers, and Defendants *knew* as much." Mot. 20–21. Yet these internal documents only demonstrate how Defendants and their employees viewed their own marketing statements—they provide no insight on how consumers reacted to those marketing statements.[15] *See In re 5HE*, 2017 WL 2559615, at *7 (testimony from

---

[15] Plaintiffs cite one case for the proposition that "[m]ateriality can be shown by a third party's, or defendant's own, market research showing the importance of such representations to purchasers." Mot. 21 (citing *Kumar v. Salov N. Am. Corp.*, 2016 WL 3844334, at *8 (N.D. Cal. July 15, 2016)). But none of the internal documents Plaintiffs have pointed to here include market research showing the importance of the amount of avocado based on the Alleged Avocado Misrepresentations. Instead,

Defendants' marketing director "does not convince the Court that materiality is subject to common proof because [it] addresses only how 5HE perceived its own branding techniques, and not how consumers reacted to the product name or the alleged misstatements on the 5HE label"). Further, these documents merely "demonstrate that avocado was 'distinctive' and 'unique' to AvoDerm (*see* Mot. 6), which it is. This is an entirely different question from whether and how consumers find the amount of avocado material to their purchasing decisions. The Poret survey says they do not. Poret Rep. 5–6.

Finally, Plaintiffs argue that "Defendants' FDA and AAFCO alleged violations for mislabeling the Products regarding the 'avocado' ingredient name and amount is also sufficient common evidence of materiality" because "materiality can be evidenced where the legislature has acted to prohibit a challenged representation." Mot. 21. As an initial matter, this is an entirely new theory. Plaintiffs did not plead any alleged FDA or AAFCO violations in their TAC (*see generally* TAC), it is inappropriate at the class certification stage, and should not be considered. *See* Motion to Strike filed concurrently herewith; *Brown v. Am. Airlines, Inc*., 285 F.R.D. 546 (C.D. Cal. 2011) ("Class certification is not a time for asserting new legal theories that were not pleaded in the complaint."). In any event, Defendants' use of the term "avocado" in the ingredient panel does not violate FDA labeling requirements, and AAFCO guidelines are not binding. Horr Rep. 6; *Roper,* 510 F. Supp. 3d at 914. Defendants were required to submit representative labels for approval in both California and Washington, "meaning these state regulators would have reviewed all AvoDerm labels and approved them before they began selling in these states." Horr Rep. 5. And Plaintiffs' argument that a reference to avocado versus dehydrated avocado would evidence materiality is a red herring and illogical because both refer to avocado, the avocado reference in the ingredient panel is not one of the Alleged Avocado Misrepresentations, and it does not speak to the amount of avocado.

### 5.    The proposed Washington class's claim requires individualized proof of causation and reliance.

While common issues do not predominate over the Washington class's proposed claims for all the reasons set forth above, Plaintiffs' WCPA claim also fails because it requires individualized proof

---

Plaintiffs point to documents regarding Defendants' general marketing strategy and regulatory compliance (*id*. at 6), which do not demonstrate how *consumers* react to the representations.

of causation and reliance. Plaintiffs must "establish that, but for the [] unfair or deceptive practice, [they] would not have suffered an injury." *Indoor Billboard*, 162 Wash. 2d at 83. "Proof of proximate cause may take the form of individual reliance." *Weidenhamer*, 2015 WL 7157282, at *4.[16]

When determining whether an individualized inquiry is required for class certification purposes, Washington courts "look[] to Plaintiffs' theory of causation." *Blough v. Shea Homes, Inc.*, 2014 WL 3694231, at *11 (W.D. Wash. July 23, 2014). When plaintiffs allege "deceptive advertising theories of consumer fraud," as Plaintiffs have done here, Washington courts consistently hold that "individualized inquiries far predominate over common questions as to the causation prong[.]" *Id.* at *12; *see also Weidenhamer*, 2015 WL 7157282, at *12 (When WCPA is "premised on affirmative misrepresentations ... individualized issues [] predominate over any common class issues."); *Kelley v. Microsoft Corp.*, 251 F.R.D. 544, 558 (W.D. Wash. 2008), *certification withdrawn*, 2009 WL 413509 (W.D. Wash. Feb. 18, 2009) (same). An "individualized analysis is necessary to determine what role [defendant's] marketing program played in each class members' purchasing decision." *Kelley*, 251 F.R.D. at 558. Determining causation would "require testimony from each class member to determine what, if any, advertising he or she saw, whether the advertisement contained [an at-issue representation] ... and whether, but for the misrepresentation, each class member would not have suffered an injury." *Helde v. Knight Transp., Inc.*, 2013 WL 5588311, at *5 (W.D. Wash. Oct. 9, 2013).

Likely recognizing that individualized issues predominate their WCPA claim, Plaintiffs ignore this long line of Washington caselaw entirely and instead argue that "[i]n false advertising class actions, [causation and reliance] may be presumed where a misrepresentation was 'material'" under Washington law. Mot. 18. This flagrantly misrepresents Washington law, and Plaintiffs do not—and cannot—provide a single Washington case to support this proposition. Instead, the only Washington case Plaintiffs point to noted that there may be a "quasi-presumption of reliance" in omission-based fraud claims. *Weidenhamer,* 2015 WL 7157282, at *13. The court clarified that any such presumption

---

[16] Plaintiffs cite to the <u>dissent</u> in *Schnall v. AT&T Wireless Services, Inc.*, 171 Wash. 2d 260 (2011) for the proposition that class members are not required to individually prove reliance. Mot. 19. But the opinion in *Schnall* reiterated the "but-for" causation requirement set forth in *Indoor Billboard*. 171 Wash. 2d at 280. Later cases applying *Schnall* have still held that causation "remains an individual inquiry[.]" *See Kelley v. Microsoft Corp.,* 2011 WL 13353905, at *4, 8 (W.D. Wash. May 24, 2011).

1  would not apply in cases involving affirmative misrepresentations and "agree[d] with Defendant that

2  Plaintiff must show individual reliance when proceeding on a theory of deception through affirmative

3  misrepresentations." *Id.* Later cases addressing the issue have come to the same conclusion. *See Geier*,

4  314 F.R.D. 692, 700 (W.D. Wash. 2016); *Blough*, 2014 WL 3694231, at *13; *Converse v. Vizio, Inc.*,

5  2020 WL 729804, *9–10 (W.D. Wash. Feb. 13, 2020). Given that Plaintiffs' case is based on affirm-

6  ative misrepresentations, rather than omissions, there is no presumption of reliance or causation.

7  ### B.    There is no reliable, let alone admissible, evidence of damages.

8  Plaintiffs must "demonstrate a class-wide method of awarding relief that is consistent with the

9  plaintiffs' theory of liability" to satisfy the predominance requirement. Mot. 21 (citing *Comcast*, 569

10  U.S. at 35). Plaintiffs must show that damages can "feasibly and efficiently be calculated once the

11  common liability questions are adjudicated." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir.

12  2013). As explained in Defendants' Motions to Exclude Gaskin and Weir (incorporated herein by

13  reference), their opinions are unreliable, inadmissible and cannot be used as common proof of dam-

14  ages. And even if they were admissible, their opinions cannot serve as common evidence of damages

15  because their model does not fit Plaintiffs' theory of liability or account for supply-side factors.

16  "[A] model purporting to serve as evidence of damages in this class action must measure only

17  those damages attributable to [plaintiffs'] theory." *Comcast*, 569 U.S. at 35. Plaintiffs' theory of lia-

18  bility is based on their belief that Defendants misled consumers as to the amount and form of avocado

19  in AvoDerm (Mot. 2–3), and Plaintiffs' damages methodology must therefore measure only the price

20  premium attributable to consumers being misled "in that particular fashion." *Larsen v. Vizio, Inc.*,

21  2017 WL 11633132, at *28 (C.D. Cal. Apr. 27, 2017). Further, "class certification can be denied under

22  *Comcast* 'when the proposed price premium (i.e. overpayment) methodology fails to ... isolate the

23  premium attributable only to the alleged misleading marketing statement.'" *McMorrow v. Mondelez*

24  *Int'l, Inc.,* 2020 WL 1157191, at *8 (S.D. Cal. Mar. 9, 2020). In false advertising actions, the "exact

25  words matter," and "[t]he exact wording of each statement is thus critical to Plaintiffs' claims and class

26  certification." *Townsend*, 303 F. Supp. 3d at 1021–23 (conjoint survey expert's alteration of label

27  statement rendered his survey "irrelevant and unreliable").

28  Gaskin and Weir do not isolate the price premium attributable to Plaintiffs' theory of liability.

– 25 –

Instead, they propose a damages methodology aimed at calculating a price premium based on the phrase Made with Avocado. *See* Gaskin Decl. ¶¶45, 55 n.40.[17] They admittedly make no effort to connect this phrase to Plaintiffs' theory. Gaskin Dep. 63:6–12 ("**Q.** [H]ow does 'made with avocado' connect with the concept of main or principal ingredient that you just brought up? **A.** Really that's beyond the scope of my assignment."), 40:22–41:10 ("**Q.** Does the dried avocado meal powder composition have any bearing on your opinions? **A.** ... [M]y survey is about the net impression that [] the consumers get from the packaging which is that it's made with avocado ... the powder is out of the scope of my assignment."). Indeed, the phrase Made with Avocado does not speak at all to the amount of avocado consumers expect AvoDerm to contain or its form. As Weir conceded, "I'm not offering opinions as to the amounts" (Weir Dep. 226:24–227:3) and "I'm not offering an opinion about [avocado powder] one way or the other." *Id.* 123:14–15. Gaskin and Weir's opinions are therefore irrelevant, because whether consumers attribute a price premium to AvoDerm being made with avocado generally is a different question than whether they attribute it to avocado being a main ingredient or present in a particular amount or form. *See Opperman*, 2017 WL 3149295, at *12 (Plaintiffs' conjoint survey "fail[ed] *Comcast*'s requirement that Plaintiff's method of proving damages is tied to their theory of liability" because it "[sought] to measure the value to consumers of privacy generally" as opposed to the "two allegedly misrepresented security features").[18]

Made with Avocado also does not appear on AvoDerm packaging or reflect the wording of any of the Alleged Avocado Misrepresentations. Gaskin Dep. 52:3–6. ("**Q.** Do you see 'made with avocado' on [the packaging]? … **A.** I don't see that phrase."). Gaskin testified that the phrase Made with Avocado was given to him by counsel and was meant to capture the "net impression" of the

---

[17] Even Plaintiffs admit that AvoDerm is in fact made with avocado, rendering that phrase literally true. *See supra* Section II.A.

[18] *See also Herron v. Best Buy Stores, LP*, 2018 WL 1960659, at *5 (E.D. Cal. Apr. 26, 2018) (denying class certification after finding Weir's damages model "fundamentally flawed because it conflate[d] 'battery life' and 'battery life representations,'" thus providing the court "no insight into whether there are damages because of the representations themselves"); *In re ConAgra Foods,* 302 F.R.D. 537, 579 (C.D. Cal. 2014) (holding that proposed damages model failed under *Comcast* because it did not "isolate the price premium associated with misleading consumers in [the] particular fashion" that plaintiffs alleged); *Larsen*, 2017 WL 11633132, at *28 (same).

communication of the package. *Id.* at 61:5–19.[19] But this isn't good enough. *See, e.g.*, *Townsend*, 303 F. Supp. 3d at 1023 (rejecting survey results that utilized a paraphrase of the alleged misrepresentations). Further, Gaskin's use of Made with Avocado means that the vast majority of the Alleged Avocado Misrepresentations are unaccounted for in his survey, which further divorces his results from Plaintiffs' theory of liability. *See Vizcarra,* 339 F.R.D. at 554 (rejecting damages model where expert failed to show survey respondents all the alleged misrepresentations); *Moore,* 2024 WL 348821, at *10 ("[The] failure to isolate the key challenged statements renders the conjoint survey incapable of calculating a reliable price premium.").

Gaskin claimed that the phrase came from the Klein survey, which found that "the [AvoDerm] packaging gives the net impression to consumers ... that the product is made with avocados." Gaskin Dep. 59:14–16. But this entirely misses the point. First, Klein did not test consumer perception of the Alleged Avocado Representations, but instead "the totality of the entire package." Klein Dep. 115:1–6. Further, while Q2 of the Klein survey included a response option that included "made with avocado," he ignores that Klein then went on to ask in Q3 about the amount of avocado in AvoDerm. See *id.* at 107:10–16; 111:18–22; 112:8–18; 115:7–15. Q2 of the Klein survey was merely a filter question, not an attempt by Klein to assess Plaintiffs' theory of liability. *Id*. Thus, while Klein was attempting to test Plaintiffs' theory of liability in Q3, Gaskin and Weir erroneously relied on the response to Q2 when adopting the Made with Avocado phrase.

Finally, Plaintiffs' proposed damages methodology fails under *Comcast* because it does not account for supply-side factors. A class-wide damages model that purports to "evaluate what a consumer would have been willing to pay for the product had it been labeled accurately" must "reflect supply-side considerations and marketplace realities that would affect product pricing." *Zakaria v. Gerber Prod. Co*., 755 F. App'x 623, 624 (9th Cir. 2018). While Gaskin and Weir baldly assert that they achieve this because "(1) the price range used in the survey reflects the actual market prices that prevailed during the Class Period, and (2) the quantity used (or assumed) in the damages calculations

---

[19] Gaskin testified, "I was asked to test what I was asked to test." *Id.* at 51:18–25, 66:3–67:18. When asked if he applied any independent thought or analysis to the use of this phrase, he went so far as to claim that doing so was "out of the scope of [his] assignment." *Id.* at 66:8– 67:12, 252:7–12.

1    reflects the actual quantity of products supplied during the Class Period" (Gaskin Decl. ¶24), the

2    weight of authority holds this is not the case. *See* Gaskin Mot. Excl.; Weir Mot. Excl.

3    **C.    The Named Plaintiffs cannot serve as class representatives.**

4    **1.    The Named Plaintiffs do not have statutory standing to seek relief.**

5    Plaintiffs who seek to represent a class must "allege and show that they personally have been

6    injured, not that injury has been suffered by other, unidentified members of the class to which they

7    belong and which they purport to represent." *Lewis v. Casey*, 518 U.S. 343, 357 (1996). A class cannot

8    "be certified if the class representative lack[s] standing as to [their] individual claim[s]." *NEI Con-*

9    *tracting & Eng'g, Inc. v. Hanson Aggregates Pac. Sw., Inc.*, 926 F.3d 528, 533 (9th Cir. 2019); *Lierboe*

10   *v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022–23 (9th Cir. 2003). At this stage, Plaintiffs'

11   mere allegations of standing are no longer sufficient, and the Court must evaluate standing based on

12   the facts and testimony. *See Turcios v. Carma Lab'ys, Inc.*, 296 F.R.D. 638, 643 (C.D. Cal. 2014)

13   (evaluating plaintiff's testimony in determining standing); *Jones*, 2014 WL 2702726, at *3–4 (same).

14   Statutory standing under the California and Washington consumer protection statutes is nar-

15   rower than Article III standing and requires Plaintiffs to prove that they "actually relied on the mis-

16   representation or omission and suffered economic injury as a result of that reliance." *Backhaut v. Ap-*

17   *ple, Inc.,* 74 F. Supp. 3d 1033, 1047 (N.D. Cal. 2014); *Donohue v. Apple, Inc.*, 871 F. Supp. 2d 913,

18   919 n.2 (N.D. Cal. 2012) (stating that the statutory standing requirements for the WCPA are the same

19   as those for the CLRA and UCL). This requires Plaintiffs to show that Defendants "conveyed false

20   information about the goods [they] purchased" and that they were deceived by those misrepresenta-

21   tions. *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1105 (9th Cir. 2013), *as amended on denial of reh'g*

22   *and reh'g en banc* (July 8, 2013); *Jones*, 2014 WL 2702726, at *4 (plaintiff lacked standing where she

23   "testified that the [accused] statement was not misleading").

24   Plaintiffs lack statutory standing to bring their claims as both testified that the specific Alleged

25   Avocado Misrepresentations were not misleading. For example, they agreed that the name AvoDerm

26   and the "O" do not imply anything about the amount of avocado in AvoDerm products. Flodin Dep.

27   169:16–170:14; Brand Dep. 213:16–25 ("**Q.** [T]he Avo in AvoDerm and the 'O' with the two leaves

28   over it could just signify that it's got avocado in it, right? **A.** Sure … **Q.** And if it does contain avocado,

– 28 –

then it's truthful, right? **A.** Yes."). Brand testified that the AvoDerm packaging does not make "any representations about principal or main ingredient" or the percentage of avocado in the formula. Brand Dep. 138:22–141:14. While both Plaintiffs claim to have inferred from the Alleged Avocado Misrepresentations that avocado was a main ingredient, their testimony on this point clearly demonstrates that they were not actually misled. Brand testified that a main ingredient could simply signify that an ingredient is a special or different ingredient, which is true. *Id*. at 216:1–11 ("**Q.** Okay. But it could also mean that it's a special ingredient, right? … **A.** A special ingredient? I guess so. Sure. **Q.** It could also mean that it's a different ingredient than you would find in other dog foods, right? **A.** Sure."). Flodin testified that a main ingredient was a "top ten ingredient" or an ingredient that is "at the top" of the label (Flodin Dep. 182:22–183:7), which is truthful. *See* Mot. Exs. 14–15. Brand also testified that he would not have an issue with the form of the avocado powder if it was made up of the "dried flesh of the avocado itself" (Brand Dep. 142:20–143:1, 145:8–22), which it is.

Brand also lacks statutory standing because he made clear that he was not relying on the Alleged Avocado Misrepresentations when he purchased AvoDerm. Instead, he testified that he purchased AvoDerm after reading "some articles" that stated that avocado was "helpful for dog's skin and general health overall." Brand Dep. 56:5–11. He purchased the product because he found the packaging "attractive" and because the product was made with local avocados. *Id.* at 58:25–59:10. He was not purchasing AvoDerm because he believed avocado was a main ingredient or was present in any particular amount of the product. *See* Doc. 102-1, CLRA Letter ("[I]n purchasing AvoDerm Natural Adult Dry Dog Food, Mr. Brand relied on the representations that the product was made with 'California avocados' and oil of 'California avocados'"); Brand Dep. 133:5–7 ("**Q.** Now, nowhere in that letter was a discussion about a main ingredient, right? **A.** Correct."), 133:12–15 (testifying that CLRA letter "reflected [his] impressions of the packaging at the time"). Brand also testified that when he made his purchase that the form of the avocado did not matter to him. *Id.* at 66:5–67:3, 151:18–24 ("**Q.** Did [the form of avocado] matter to you? **A.** No.").

### 2.    Nor are the Named Plaintiffs typical of the proposed classes.

Rule 23(a)(3) requires plaintiffs to show that their claims are "typical" of the class by showing that they suffered "the same or similar injury" as other class members. *See Hanon v. Dataproducts*

1    *Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). Typicality is not satisfied if the plaintiffs would be "preoc-

2    cupied with defenses unique to" them. *Ellis*, 657 F.3d at 984 (9th Cir. 2011). For the same reason they

3    lack statutory standing, Plaintiffs are not typical because they were not deceived. *Stearns*, 655 F.3d at

4    1019 (if a plaintiff's testimony shows that she "was not really deceived," then she "is not at all typical

5    of [a] proposed class"); *Jones*, 2014 WL 2702726, at *7 (given "testimony that the statement she relied

6    on was not misleading, she is not typical of a class of consumers who were allegedly misled.").

7        Moreover, Plaintiffs were not allegedly injured in the same way as proposed class members.

8    Plaintiffs request certification of a class of all AvoDerm purchasers, regardless of whether they pur-

9    chased online or in-store. Plaintiffs will be subject to unique defenses because they have provided no

10   evidence about deception stemming from representations on Defendants' website or other online

11   sources. Their only evidence is Klein's survey of consumers' perceptions of the Product's packaging

12   alone. Klein Dep. 34:6–18 ("**Q.** Now, you and your survey only tested a package, right? **A.** Correct.

13   **Q.** Did you test any other advertising? **A.** No. **Q.** Did you test any Facebook posts? **A.** No. **Q.** Did you

14   test any online banner advertising for AvoDerm? **A.** Not specifically, no. **Q.** Did you test any adver-

15   tising in magazines? **A.** Not specifically."). But both Plaintiffs testified that they were allegedly de-

16   ceived by statements that were not on the packaging. For example, Brand testified that his understand-

17   ing came from what he saw "on the website" where "I saw key ingredient." Brand Dep. 241:16–25.

18   Similarly, Flodin testified that he "wasn't relying on the package" to purchase the product; his under-

19   standing was based on online language stating avocado was a "Top 10" ingredient, which he said, "in

20   my mind, represent[s] a main ingredient." Flodin Dep. 170:20–174:3, 175:8–176:8. Denial of class

21   certification is appropriate because Plaintiffs had a "materially different ... purchasing experience"

22   compared to the class they seek to represent. *Spacone v. Sanford, L.P.*, 2018 WL 4139057, at *9 (C.D.

23   Cal. Aug. 9, 2018) ("Given the Court's finding that Spacone lacks standing in this case, along with the

24   materially different [] purchasing experience between Spacone and a significant proportion of his pro-

25   posed class, Spacone's claims are not typical of the proposed class as the class is currently defined.").

26                              **V.    CONCLUSION**

27        For these reasons, Defendants respectfully request that the Court deny Plaintiffs' Motion for

28   Class Certification.

Dated: July 16, 2024

WINSTON & STRAWN LLP

By:  /s/ *Ronald Y. Rothstein*
　　Ronald Y. Rothstein (*pro hac vice*)
　　RRothste@winston.com
　　Sean H. Suber (*pro hac vice*)
　　SSuber@winston.com
　　WINSTON & STRAWN LLP
　　35 West Wacker Drive
　　Chicago, IL 60601-9703
　　Telephone: (312) 558-5600
　　Facsimile: (312) 558-5700

　　Shawn R. Obi (SBN: 288088)
　　SObi@winston.com
　　WINSTON & STRAWN LLP
　　333 South Grand Avenue
　　Los Angeles, CA 90071-1543
　　Telephone: (213) 615-1700
　　Facsimile: (213) 615-1750

　　*Attorneys for Defendants*
　　*Central Garden & Pet Company and*
　　*Breeder's Choice Pet Foods, Inc.*